[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16345
_____

D.C. Docket No. 4:15-cv-10001-JLK


RAYMOND BERTHIAUME,

Plaintiff-Appellant,

versus

DAVID T. SMITH,
individually, and
CITY OF KEY WEST,
a Florida Municipal corporation,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 22, 2017)

Before HULL, JORDAN and GILMAN,[*] Circuit Judges.

PER CURIAM:

Defendants David T. Smith and the City of Key West (collectively "defendants") moved for panel rehearing of an opinion originally filed on October 5, 2017 and reported at __ F. App'x __, 2017 WL 4422465.  Defendants also moved for publication of the opinion.  We grant in part and deny in part the defendants' motion for panel rehearing, grant the defendants' motion for publication of the opinion, vacate our prior opinion, and substitute for it the following opinion.

Raymond Berthiaume brought suit against Lieutenant David Smith of the Key West Police Department and the City of Key West ("the City") under 42 U.S.C. §§ 1983 and 1988 and Florida law, alleging claims of excessive force, false arrest, false imprisonment, battery/unnecessary force, and malicious prosecution, arising from Lieutenant Smith's October 2013 arrest of Berthiaume.  Following a three-day trial, the jury returned a verdict in favor of the defendants, and the district court subsequently denied Berthiaume's motion for a new trial.

On appeal, Berthiaume contends that he was denied a fair trial by an impartial jury.  Berthiaume asserts, inter alia, that the district court abused its discretion in failing to ask jurors his proposed voir dire question, which was: "Do

---

[*]Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

you harbor any biases or prejudices against persons who are gay or homosexual?" After review, and with the benefit of oral argument, we conclude that, given the particular facts and circumstances in this case described below, the district court abused its discretion in not asking that question. We explain why.

## I.  FACTUAL BACKGROUND

This case involved an altercation between two gay men who formerly had been partners. The following evidence was introduced at trial.

On the evening of October 26, 2013, Berthiaume attended the Fantasy Fest parade in Key West, Florida with his then-partner and now-husband, Jhon Villa, his friend Corey Smith, and his former male partner, Nelson Jimenez. After the parade, Berthiaume and his companions remained in the area for the street party that followed. By the early morning hours of October 27, Berthiaume, Villa, and Smith were ready to go home and returned to their car, which was parked on a nearby street. Jimenez was not ready to leave and remained in one of the area gay bars.

After waiting for Jimenez by the car for some time, Berthiaume returned to the bar to find Jimenez and escort him back to the car so that the group could leave. As Berthiaume led Jimenez out of the bar with his hand on Jimenez's upper arm, Jimenez took the car keys from Berthiaume, twisted out of Berthiaume's grip, and ran down an adjacent alleyway. Berthiaume, clad only in boxer shorts or a

3

loin cloth and flip flops,[1] followed Jimenez to retrieve the keys. During his pursuit

of Jimenez, Berthiaume became frustrated and banged his hand against a street

sign before continuing down the alleyway.

Lieutenant Smith and several other officers were on duty patrolling the

Fantasy Fest area that night. Lieutenant Smith and another officer observed the

interaction between Berthiaume and Jimenez as they left the bar and believed that

they were witnessing a fight or altercation between the two men. Lieutenant Smith

testified that Berthiaume appeared to be swatting and grabbing at Jimenez with

both hands as Jimenez tried to pull away, while the other officer testified that the

only physical contact that occurred between the two men was Berthiaume's

grasping of Jimenez's upper arm as he attempted to escort Jimenez back to the car.

Although Berthiaume and one of his companions testified that Berthiaume was

walking as he followed Jimenez down the alleyway, Lieutenant Smith and other

officers testified that Berthiaume chased Jimenez down the alley and that both men

were running.

Lieutenant Smith and the other officers who were in the vicinity ran toward

the alley to intervene. When he caught up to Berthiaume, Lieutenant Smith pushed

Berthiaume in the shoulder to stop him from pursuing Jimenez, causing

---

[1]The witnesses agreed that Berthiaume was shirtless and wearing flip flops at the time of his arrest, but differed in their descriptions of the rest of Berthiaume's attire. The police-officer witnesses described Berthiaume's outfit as a loin cloth, while Berthiaume and his companions stated that he was wearing boxer shorts.

4

Berthiaume to fall to the ground.  As a result of his fall, Berthiaume suffered a fractured wrist and jaw, both of which ultimately required surgery.

Lieutenant Smith spoke to Jimenez at the scene.  Jimenez initially thanked Lieutenant Smith for intervening, but later stated that nothing wrong had happened, and he did not want to press charges against Berthiaume.  According to Lieutenant Smith, Jimenez told him that he and Berthiaume were former partners and that they were trying to get back together.[2]

Despite Jimenez's unwillingness to press charges against Berthiaume, Lieutenant Smith chose to arrest Berthiaume and charge him with domestic battery.[3]  Lieutenant Smith explained that "in domestic situations" such as this, "there is preferred arrest by the State of Florida" in order to ensure that the aggressor and victim are separated at least for the rest of the evening.  Lieutenant Smith further indicated that an arrest was appropriate regardless of Jimenez's desire not to press charges because Lieutenant Smith personally had observed the battery on Jimenez.  Lieutenant Smith also noted that victims of domestic battery sometimes "have different emotions for [the person who assaulted them] that make them not want to say something against that person because they don't want something bad to happen to them for their future."

---

[2]Lieutenant Smith's arrest affidavit indicates that it was Berthiaume, rather than Jimenez, who provided this information to the officers.

[3]The State subsequently declined to prosecute Berthiaume.

## II.  MOTION FOR NEW TRIAL

The jury ultimately returned a verdict in favor of the defendants.

Berthiaume filed a motion for new trial, arguing in part that he was deprived of a

fair trial with an impartial jury when the district court refused to question the

venire members regarding any potential bias they might have toward persons who

are gay or homosexual.  Berthiaume noted that homosexuals had only recently

begun to gain acceptance in society, and many people still harbor bias or prejudice

against homosexuals.  Accordingly, Berthiaume contended that in a case such as

his, involving both a gay party and gay witnesses, it is necessary for courts to

inquire into prospective jurors' potential biases against homosexuals to ensure a

fair trial.

The district court denied Berthiaume's motion for new trial.

## III.  DISCUSSION

"The Constitution guarantees both criminal and civil litigants a right to an

impartial jury," and "voir dire can be an essential means of protecting this right."

Warger v. Shauers, __ U.S. __, __, 135 S. Ct. 521, 528-29 (2014).  Although the

conduct of voir dire is largely "left to the sound discretion of the trial court," the

district court's voir dire must at least "provide reasonable assurance that prejudice

will be discovered if present."  United States v. Hill, 643 F.3d 807, 836 (11th Cir.

2011) (internal quotation marks omitted).  This means that, in circumstances

6

"where juror prejudices are reasonably suspected" on a particular subject, due process requires the court to ask questions on voir dire specifically to address that subject.  See United States v. Ochoa-Vasquez, 428 F.3d 1015, 1037 (11th Cir. 2005); see also, e.g., Morgan v. Illinois, 504 U.S. 719, 735-36, 112 S. Ct. 2222, 2233 (1992) (holding that, in a capital case, trial courts must inquire about juror's views on the death penalty); Ham v. South Carolina, 409 U.S. 524, 529, 93 S. Ct. 848, 851 (1973) (holding that, under certain circumstances, trial courts must inquire about racial bias); Jordan v. Lippman, 763 F.2d 1265, 1280-82 (11th Cir. 1985) (holding that, in a case involving considerable pre-trial publicity, the district court must specifically inquire about prospective jurors' exposure to the pre-trial publicity).

To determine whether specific questioning is necessary in a given case, courts look to whether, under all of the circumstances presented, there is a reasonable possibility that a particular type of prejudice might have influenced the jury.  Rosales-Lopez v. United States, 451 U.S. 182, 190-92, 101 S. Ct. 1629, 1635-36 (1981); see also Ristaino v. Ross, 424 U.S. 589, 596-98, 96 S. Ct. 1017, 1021-22 (1976) (concluding that specific questioning about racial bias was not necessary where the particular circumstances of the case "did not suggest a significant likelihood that racial prejudice might infect [the] trial").  "The critical factor" in making this determination is whether the potentially prejudicial issue is

7

"inextricably bound up with the conduct of the trial," such that there is a "consequent need, under all the circumstances, specifically to inquire into [the] possible [specific] prejudice in order to assure an impartial jury." Rosales-Lopez, 451 U.S. at 189, 101 S. Ct. at 1635 (internal quotation marks omitted).

Here, at the outset, it was obvious to the district court and the parties that this case involved an alleged domestic battery between former partners of the same sex, and that the sexual orientation of Berthiaume and his witnesses would be central facts at trial and were "inextricably bound up" with the issues to be resolved at trial. Id. at 189. First, the complaint refers to Villa as Berthiaume's "partner" and to Jimenez as his "ex-partner." The complaint alleges that Berthiaume and his partner Villa wanted to leave a public area and retire for the evening, but ex-partner Jimenez wanted to stay, took Villa's keys and ran. Berthiaume ran after Jimenez to get the keys. The complaint further states that in the arrest affidavit, Lieutenant Smith falsely stated that the dispute between Berthiaume and Jimenez arose because they were "trying to get back together," a fact Berthiaume denied. Moreover, the parties stipulated in their joint pretrial statement, and the arrest affidavit confirmed, that Lieutenant Smith charged Berthiaume with "domestic battery," which Berthiaume disputed. Berthiaume's lawsuit challenged Lieutenant Smith's false basis for arresting him and Lieutenant Smith's use of force to effectuate that arrest. So the relationship between

8

Berthiaume and Jimenez, and the nature of the alleged domestic dispute between them as former partners, was of critical importance.

Further, after the district court ruled against Berthiaume's request for a supplemental voir dire question on sexual orientation bias, Berthiaume's counsel raised a Batson[4] challenge to the defendants' use of peremptory challenges against two potential jurors who he perceived as gay, explaining to the district court that "the evidence in this case will show that my client and all of his witnesses are gay." Based on the district court's sidebar with the attorneys concerning the Batson challenge, it was clear at that point that additional questioning on sexual orientation bias was necessary.

But the district court here did not ask any questions to determine whether any of the jurors might harbor prejudices against Berthiaume based on his sexual orientation. Nor were the district court's general inquiries regarding the jurors' ability to be impartial and its instruction that jurors not be prejudiced against witnesses based on the witnesses' backgrounds sufficient to reach the important concerns highlighted by Berthiaume's proposed inquiry because the general inquiries were broadly framed and not calculated to reveal latent prejudice. See Morgan, 504 U.S. at 734-36, 112 S. Ct. at 2232-33 (explaining that, where a reasonable possibility of prejudice on a specific subject exists, general questions

---

[4]Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986).

about fairness and impartiality are insufficient to address the specific concern).  As a result, under the particular facts and circumstances of this case, the district court abused its discretion by failing to inquire about prejudice on the basis of sexual orientation during voir dire.  See id.

Further, under these facts and circumstances, there is a "reasonable possibility that [sexual orientation bias] might have influenced the jury."  See Rosales-Lopez, 451 U.S. at 192, 101 S. Ct. at 1636.  Given the long history of cultural disapprobation and prior legal condemnation of same-sex relationships, the risk that jurors might harbor latent prejudices on the basis of sexual orientation is not trivial.  See Obergefell v. Hodges, __ U.S. __, __, 135 S. Ct. 2584, 2596-97 (2015).  Just two terms ago in Obergefell, the Supreme Court noted that for much of the 20th century, homosexuality was considered a mental illness, and same-sex intimacy was prohibited by law in many states.  Id. at 2596.  And despite the more recent "shift in public attitudes toward greater tolerance," Obergefell itself is evidence that issues regarding homosexuality continue to be debated in our society.  See id. at 2597.  While some jurors are not biased based on sexual orientation, some realistically are.

In contrast to the parties and the court, the jury, at the time of voir dire, had no reason to know that this case involved an alleged domestic dispute between former partners of the same sex or that Berthiaume's sexual orientation or that of

10

his witnesses would be a part of the evidence at trial.  Consequently, they had no reason to offer up prejudices they might harbor on that basis when the district court posed its general questions regarding bias.  Moreover, the district court here asked the jurors multiple questions about any biases or prejudices they might have against law enforcement.  But the district court refused to ask any questions at all about prejudice on the basis of sexual orientation.  Therefore, we have no way to discern whether the jury was biased against Berthiaume for that reason.  Given the pretrial documentation concerning Berthiaume's homosexual relationships with both Villa and Jimenez, and the characterization of the altercation that led to Berthiaume's arrest as a domestic dispute, the risk that latent, undiscovered prejudices may have influenced the jury's verdict is substantial.

And this is not a case where that pretrial notice that sexual orientation was a pivotal fact proved false; instead, that notice proved well-founded.  Indeed at trial, in describing the events leading up to Berthiaume's arrest, the witnesses repeatedly testified about Berthiaume's romantic relationships with Jimenez and Villa and what role, if any, the relationships played in the dispute between Berthiaume and Jimenez on the night in question.  Additionally, in explaining why he felt it necessary to arrest Berthiaume despite Jimenez's refusal to press charges, Lieutenant Smith explained that victims are often reluctant to press charges in "domestic situations" such as these because they have mixed emotions about the

11

perpetrator.  Thus, the district court's error in this case was not harmless, and Berthiaume is entitled to reversal.  See Rosales-Lopez, 451 U.S. at 192, 101 S. Ct. at 1636.

As explained above, whether specific voir dire questioning is required in a given case is a fact-specific inquiry which looks to the totality of the circumstances presented in that case and whether the district court had notice of the nature of the dispute.  See Rosales-Lopez, 451 U.S. at 189-92, 101 S. Ct. at 1635-36.  Thus, although we conclude that the district court erred in refusing to inquire about sexual orientation bias in this particular case, we do not hold that refusal to do so would be an abuse of discretion in every case.  Rather, whether a district court abuses its discretion by failing to ask a proposed voir dire question about sexual orientation bias will depend on the subject matter and issues in the case and what notice the district court has that issues of sexual orientation will potentially be a central part of the evidence at trial.  And if the court has notice, parties requesting such questioning during voir dire should aid the district court by explaining, at the time the request is made, the factual basis for the requested question.

## IV.  CONCLUSION

For the foregoing reasons, we vacate the district court's final judgment in favor of the defendants and remand for a new trial.

**VACATED AND REMANDED.**[5]

---

[5]In light of our decision, we need not consider Berthiaume's alternative ground for a new trial based on the defendants' exercise of peremptory challenges in alleged violation of <u>Batson</u> and its progeny.

13