*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

UNPUBLISHED
March 31, 2022

v

JEFFREY MARTIN SIX,

      Defendant-Appellant.

No. 338238
Wayne Circuit Court
LC No. 16-001862-01-FH

AFTER REMAND

Before: STEPHENS, P.J., and K. F. KELLY and BOONSTRA, JJ.

STEPHENS, P.J. (*concurring in part, dissenting in part*).

I concur, but write to depart from the majority on the issue of voir dire. Unlike the majority I believe that the failure to allow voir dire regarding attitudes, bias and experiences with the LGBT+ community was an abuse of discretion that deprived defendant of an impartial jury.

Defendant argues that his status as a gay man was a source of potential prejudice and was inextricably bound up with the conduct of the trial and, as a result, the trial court should have questioned the prospective jurors regarding potential anti-LGBT bias. I agree.

The majority has accurately outlined both the facts of the case and procedural history. The manner in which a trial court conducts voir dire is reviewed by this Court for an abuse of discretion. *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000). "An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes." *People v Baskerville*, 333 Mich App 276, 287; 963 NW2d 620 (2020).

Although trial courts have wide discretion in the manner employed to achieve an impartial jury, *People v Sawyer*, 215 Mich App 183, 186-187; 545 NW2d 6 (1996), when the trial court, instead of the attorneys, conducts voir dire, "the court abuses its discretion if it does not adequately question jurors regarding potential bias so that challenges for cause, or even peremptory challenges, can be intelligently exercised," *Tyburski*, 445 Mich at 619 (citation omitted). Accordingly, "a trial court may not restrict voir dire in a manner that prevents the development of a factual basis for the exercise of peremptory challenges." *People v Taylor*, 195 Mich App 57, 59;

489 NW2d 99 (1992). That is, a trial court should not limit voir dire in a manner that restricts an "intelligent assessment of bias." *Tyburski*, 445 Mich at 623.

Failure to conduct a sufficiently probative voir dire regarding prejudices that may influence a juror's decision does not adequately protect a litigant's right to a fair trial and impartial jury. See *Ham v South Carolina*, 409 US 524, 526-527; 93 S Ct 848; 35 L Ed 2d 46 (1973). When there exists a "reasonable probability" that a particular prejudice might influence the jury, courts must allow specific questioning during voir dire regarding that issue. See *Rosales-Lopez v United States*, 451 US 182, 191-192; 101 S Ct 1629; 68 L Ed 2d 22 (1981); see also *Ristaino v Ross*, 424 US 589, 596-598; 96 S Ct 1017; 47 L Ed 2d 258 (1976) (holding that specific questions regarding racial bias were not necessary when the circumstances of the case "did not suggest a significant likelihood that racial prejudice might infect [the] trial."). The critical factor for "making this determination is whether the potentially prejudicial issue is 'inextricably bound up with the conduct of the trial,' such that there is a 'consequent need, under all the circumstances, specifically to inquire into [the] possible [specific] prejudice in order to assure an impartial jury.' " *Berthiaume v Smith*, 875 F3d 1354, 1358 (CA 11, 2017), quoting *Rosales-Lopez*, 451 US at 189.[1]

On remand, Serra acknowledged having concerns regarding bias against LGBT people and indicated that, at a pretrial conference in chambers, he "made clear" that he believed "it was essential that the jury be questioned about" anti-LGBT bias. Serra wanted to ask the prospective jurors whether they knew any LGBT people, if they had any LGBT friends or relatives, or if they thought that LGBT people were more likely to be dishonest or commit crimes. Serra testified that, regarding whether prospective jurors would be questioned about LGBT issues, he "vividly recall[ed], at the very end of the conference, the Judge saying, I find that most people can be pretty fair about that sort of thing, most of the time, Mr. Serra." Serra believed "that that's pretty much a direct quote, because that really stood out to [him], because it was at the end."

The trial court was adamant that it did not address the issue of anti-LGBT bias because "[i]t was a matter of trying to stay on point." The trial court articulated its "motivation was to keep the case focused, not confuse the jury with what [he] regarded as extraneous information . . . ." The trial court wanted to keep the jury "focused on the issue of whether or not the defendant committed the crimes that he was charged with, and not go off on social tangents, that . . . you may think are important, but I didn't think were important to this case." To clarify, counsel asked the trial court: "[S]o the decision to deny voir dire, on the topic of anti-L.G.B.T bias . . . was not based on the belief by the Court that anti-gay prejudice is not a problem?" The trial court answered, "No" and that it "ha[d] no such belief. I don't know if it's a problem or not a problem." Additionally, the trial court stated its concern was "it was not an issue in this case" and that "the case could have been tried without the jury ever knowing that the defendant was gay." The trial court added: "[I]t was about as relevant as his shoe size." Moreover, the trial court stated that it would have allowed the voir dire, or conducted it itself, if it believed it was a "central issue in the case" or "the credibility of a witness might be decided on the basis of an anti-L.G.B.T bias . . . ."

---

[1] Decisions of lower federal courts are not binding on this Court, but they may be considered as persuasive authority. *People v Walker (On Remand)*, 328 Mich App 429, 444-445; 938 NW2d 31 (2019).

The trial court also addressed Serra's request to query prospective jurors about membership in the American Family Association [AFA], an organization Serra characterized as, "dedicated to what they call[] traditional family values" and that has "taken public positions against" same-sex relationships and marriage. Concluding that there could be approximately 330 people in Wayne County who were members of the AFA (based on the approximate 100,000 members of the AFA in the United States as a whole), the trial court described the "prospects of one of them being on a twenty-five person jury pool" in Wayne County as "virtually non-existent" and "close to non-existent." The trial court admitted it was "very hesitant" about asking prospective jurors about potential membership in the AFA, just as it would have been to ask "what their religious beliefs are . . . ." The trial court recognized, however, that "inquiring about religious beliefs might unveil some indication of a possible anti-gay bias," although it "suspect[ed] that our appellate courts would not condone, or approve" of inquiries into jurors' "religious beliefs, or social beliefs, or what political party they belong to, and so on." Counsel referenced several public opinion polls from Michigan, including one from the year in which defendant's trial was held. That specific poll showed "over a third of the people polled, voters, potential jurors, uhm [sic], had anti-gay marriage attitudes." Counsel believed that "in a case where the theory of defense was that, [defendant] was framed by [his] lover, who [he] trusted so much, and why [he] was so gullible," those polls provided a compelling reason to "explore juror bias" related to the LGBT community.

The trial court also explained that when it revoked defendant's jury waiver, it had "some reason" to take "a deep dive into the defense's conspiracy theory" regarding Orsette's involvement. The trial court stated that "defendant's conspiracy theory" was "very convoluted" and "essentially irrelevant" because the prosecution's evidence against defendant for the crimes with which he was charged was "apparent." Defendant's theory was also described by the trial court as "far[]fetched" and "just off point," while the prosecution's case was described as "pretty strong, and pretty clear, and fairly simple . . . ." Thus, the trial court "pretty much" overruled "the defense's ability to . . . try to float that conspiracy theory." The trial court also noted that Orsette refused to testify, so there "wasn't even any way" for Serra to have "proven, with competent evidence, the conspiracy theory that he had in mind." Accordingly, the trial court "didn't really see that the defendant's sexual orientation was an issue[] in the case." In fact, the trial court noted, the prosecution's case was tried "without any reference to the defendant's sexual orientation."

The trial court abused its discretion when it denied voir dire regarding anti-LGBT bias. While the court has broad discretion in trial management, it is left to the defendant and trial counsel to determine the theory of defense within the confines of the law. The trial court clearly articulated its view that the theory of conspiracy arising from a failed relationship was not likely to be successful but it did not find that the theory was contrary to the law of the state. The trial court believed that unless the case was about same-sex relationships or marriage, queries regarding jurors' experience, knowledge, and attitudes regarding those issues and LGBT people generally were irrelevant. Indeed, the trial court stated that had this been a sexual assault case with same-sex actors, or a domestic violence case with a same-sex relationship, it "would have made a very different call, because, then, the orientation of the parties, or one party or the other" would be "a sort of central fact in the case." But, the trial court stated, "that was not the case here." The trial court regarded the fact that defendant was in a same-sex relationship with Orsette as "extraneous information" and it did not want to "go off on social tangents" that it "didn't think were important to this case." True, the sexual orientation and relationship of defendant and Orsette were not central issues in this case related to financial crimes. But defendant's theory was that Orsette

-3-

orchestrated the fraud at issue by virtue of abusing defendant's trust in their relationship. And because the believability of that theory depended on defendant's credibility, attitudes regarding issues that may affect that credibility, i.e., anti-LGBT bias, are relevant inquiries.

Moreover, the trial court and the parties were aware of defendant's theory of the case before trial began. As discussed earlier, Serra explained his theory of the case to the trial court and prosecutor during an in-chambers conference. Serra also testified that, at a pretrial conference in chambers, he "made clear" his belief that it "was essential that the jury be questioned about bias" against the LGBT community and whether they had been, or knew anyone who had been, in an abusive relationship. Serra "vividly recall[ed]" the trial court saying, "I find that most people can be pretty fair about that sort of thing, most of the time, Mr. Serra." At the remand hearing, the trial court acknowledged being aware of defendant's theory around the time of trial and believed it was an "essentially irrelevant" "conspiracy theory." Despite its awareness that defendant was in a same-sex relationship and blamed his partner for the crimes at issue, the trial court declined to ask any specific questions to determine whether any of the prospective jurors may harbor prejudices against defendant based on his sexual orientation. The trial court's failure to ask questions during voir dire about anti-LGBT bias improperly restricted voir such that it prevented an "intelligent assessment of bias." *Tyburski*, 445 Mich at 623; see *Morgan v Illinois*, 504 US 719, 734-736; 112 S Ct 2222; 119 L Ed 2d 492 (1992) (explaining that, where there exists a reasonable probability of prejudice on a specific subject, general questions regarding fairness and impartiality do not sufficiently address the specific concern).

Additionally, there is a "reasonable possibility" that bias regarding sexual orientation may have influenced the jury. See *Rosales-Lopez*, 451 US at 192. As articulated in *Berthiaume*:

> Given the long history of cultural disapprobation and prior legal condemnation of same-sex relationships, the risk that jurors might harbor latent prejudices on the basis of sexual orientation is not trivial. Just two terms ago in *Obergefell*[ *v Hodges*, 576 US 644; 135 S Ct 2584; 192 L Ed 2d 609 (2015)], the Supreme Court noted that for much of the 20th century, homosexuality was considered a mental illness, and same-sex intimacy was prohibited by law in many states. And despite the more recent "shift in public attitudes toward greater tolerance," *Obergefell* itself is evidence that issues regarding homosexuality continue to be debated in our society. While some jurors are not biased based on sexual orientation, some realistically are. [*Berthiaume*, 875 F3d at 1359 (citations omitted).]

The disclosure of defendant's sexual orientation was not discreet. On direct examination, defendant testified about his same-sex relationship with Orsette and expressed his belief that Orsette was the one who committed the crimes at issue. On cross-examination, defendant acknowledged that he saw his relationship with Orsette as "a miracle [sic: marital] type relationship." Thereafter, however, the prosecutor extensively questioned defendant about his relationships with several other male partners, including some while he was in a relationship with Orsette. This line of questioning appears to have served two purposes: (1) to reveal that defendant habitually lied about his dealings with other persons and that he engaged in a pattern of false accusations against his partners and ex-partners; and (2) to reveal that defendant associated with other partners at the same time he allegedly had a marital-type relationship with Orsette. That is, the prosecutor used defendant's relationships with various men to attack defendant's credibility.

In a case where defendant's credibility was of critical importance—because he claimed that Orsette was the one who actually committed the crimes at issue and had abused his relationship with defendant to do so—the risk that the jury's verdict may have been influenced by "latent prejudices on the basis of sexual orientation" is substantial. *Berthiaume*, 875 F3d at 1360. Again, although defendant's sexual orientation and the former relationship between defendant and Orsette may not be the central issues here, defendant's credibility was of the utmost importance. And attitudes regarding issues that may affect that credibility—such as defendant's sexual orientation— are relevant inquiries that should be sufficiently probed during voir dire. The trial court declined to ask prospective jurors about potential anti-LGBT bias because it did not believe it was relevant to the issues at trial, despite indicating that it would have allowed such questions if "the credibility of a witness might be decided on the basis of an anti-L.G.B.T bias . . . ." Therefore, I conclude there was a substantial risk that defendant's credibility may have been affected on the basis of an anti-LGBT bias. Accordingly, the trial court's failure to explore anti-LGBT bias during voir dire was an abuse of discretion that deprived defendant of an impartial jury and, thus, he is entitled to a new trial.

/s/ Cynthia Diane Stephens

-5-