*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEFFREY MARTIN SIX,

        Defendant-Appellant.

UNPUBLISHED
March 31, 2022

No. 338238
Wayne Circuit Court
LC No. 16-001862-01-FH

AFTER REMAND

Before: STEPHENS, P.J., and K. F. KELLY and BOONSTRA, JJ.

PER CURIAM.

Defendant appealed as of right his jury convictions of uttering and publishing a false instrument, MCL 750.249, and receiving or concealing stolen property with a value of more than $1,000, MCL 750.535(2)(a). The trial court sentenced defendant to two years' probation which he has now successfully completed. On appeal, we remanded to the trial court to further develop the record on the issue of voir dire, retaining jurisdiction. We now affirm.

## I. FACTS AND PROCEEDINGS

This Court previously articulated the facts from which defendant's convictions arose as follows:

> Defendant's convictions arise from a scheme to fraudulently use the bank account of an innocent third party, Forrest Health Services (Forrest Health), to make online payments of driver responsibility fees on the Michigan Department of Treasury's website. The online payments were made in substantially greater amounts than the amounts due. The overpayments were credited to the online accounts of the driver who was liable for the driver responsibility fee. Four such payments were made on July 9, 2014, including a payment of $15,000 for defendant, whose driver responsibility fee was $150, a payment of $50,500 for Gordon Orsette, and overpayments for two other persons. Orsette and defendant were involved in a same-sex relationship at the time the overpayments were made.

The overpayments for Orsette and the two other persons were reversed before they were credited toward their respective driver responsibility accounts. No refunds were issued for these three overpayments. However, the $15,000 payment was credited to defendant's driver responsibility account, for which he owed a $150 fee. The payment was made from a Forrest Health account without that payer's authorization. The Department of Treasury later approved a refund payment to defendant for $14,850. Defendant cashed the check at a party store. In September 2014, Forrest Health notified the Department of Treasury that its account had been hacked. The state refunded the unauthorized $15,000 payment to Forrest Health and began an investigation of defendant's refund payment.

The defense theory at trial was that Orsette told defendant that he paid defendant's driver responsibility fee out of Orsette's own account, accidentally adding two zeros to the amount paid. Defendant testified at trial that he cashed the check and gave the proceeds to Orsette because he did not know that Orsette's online payment was fraudulent. [*People v Six*, unpublished per curiam opinion of the Court of Appeals, issued January 21, 2020 (Docket No. 338238), pp 1-2.]

On appeal, defendant argued he was denied a fair trial by the trial court's refusal to question prospective jurors during voir dire regarding any potential anti-LGBT bias. *Six*, unpub op at 2. We were unable to determine the basis for the trial court disallowing voir dire regarding juror perception, bias, or experience with the LGBT community, nor the arguments, facts, and law presented to the judge. *Id*. at 5. Thus, we remanded to the trial court for "settlement of the record," *id*., instructing the trial court in our accompanying order to "articulate its reasons for denying defendant voir dire to question the jury for any anti-LGBT bias," *People v Six*, unpublished order of the Court of Appeals, entered January 21, 2020 (Docket No. 338238), and retained jurisdiction.

On remand, a hearing was held at which defendant's trial counsel, Rudolph Serra, testified. Serra was concerned about anti-LGBT bias among jurors and, at a pretrial conference in chambers, he expressed his belief that it was "essential" for the prospective jurors to be questioned about anti-LGBT bias. According to Serra, this line of questioning would have included asking whether they knew anyone in the LGBT community or believed that members of that community were more likely to be dishonest or commit crimes. Serra "vividly recall[ed]" that, at the end of the pretrial conference and related to whether prospective jurors would be questioned about LGBT issues, the trial court said, "I find that most people can be pretty fair about that sort of thing, most of the time, Mr. Serra." The trial court disallowed the requested voir dire.

After testimony and limited argument, the trial court provided its reasoning of its ruling:

THE COURT: [The ruling] was a matter of staying on point.

Uhm, you know, I – and reeling back a bit, uhm, when I, uhm, revoked the waiver in this case, it was because I had had some reason to, uh, to take a, a deep dive into the defendant's conspiracy theory.

And I don't know if it was a motion in limine, or, or how it came to my attention, before trial, but I, I came to understand the defendant's conspiracy theory, which

-2-

was very, you know, I saw – I said it then, and I'll say it again, very convoluted and essentially irrelevant, because the People's evidence, against the defendant, for having participated in this fraudulent theft of, of approximately fifteen thousand dollars worth of State money, was, uhm, apparent.

Now, Gorden Orsetti [sic] may also have participated, in some way.

And maybe he even, insome [sic] way directed the, the fraud, but ultimately, it was the defendant who engaged in various acts along the way, that were proven, and established by the People in their case, that created a very strong question of fact on whether or not he was a direct, or even sole participant in the, uh, in the fraud; or, at the very least, a, uh, an aider and abettor.

And then, by all accounts, he was the, the person who profited from it as well.

Uhm, the People's case was pretty strong, and pretty clear, and fairly simple.

And the defendant's conspiracy was just off point.

Uhm, my, uhm – and then, without that conspiracy theory, uhm, being a part – and I, and I did order the, that neither the – well, the, People wouldn't, of course, embarked on, on trying to disprove the theory in their case in chief.

But I did, pretty much overrule the, the defense's ability to, try to float that conspiracy theory.

And then, of course, as the record shows, George Orsetti[sic] uh, in the end, refused to testify, anyway.

He took the Fifth Amendment, and so that was that.

There really wasn't even any way that Mr. Serra could have proven, with competent evidence, the conspiracy theory that he had in mind.

Uhm, you know, and as result of all of that, *I really didn't see that defendant's sexual orientation was an issue in the case.*

*You know, the case could have easily been tried, and actually with, as far as the People's proofs were concerned, it was tried, without any reference to the defendant's sexual orientation.*

Now, if this had been a sex assault case, involving same sex actors; or a domestic violence case, involving a same sex relationship, or partnership, or marriage; uhm you know, obviously, that would made, I would have made a very different call, because, then, the orientation of the parties, or one party or the other, is, is a sort of central fact in the case.

But that was not the case here.

And, so, my, I guess to go back to your question, directly, to make a, in an effort to make a long story, short, uhm, my effort wasn't really to save time.

Because if I thought there was issues that needed to be flushed out, in the trial, and that the jury needed to hear, in order to consider, ultimately, whether the defendant committed the crime he was charged with, uh, you know, I would have presided over the trial in a month, if I thought that's what had to happen.

* * *

My, my effort, or my motivation was the keep the case focused, not confuse the jury with what I regarded as extraneous information, to keep their attention focused on the issue of whether or not the defendant committed the crimes he was charged with, and not go off on social tangents, that, uhm, you may think are important, but I didn't think were important to this case. (Emphasis added.)

Subsequently, the trial court further reiterated that sexual orientation was "not an issue in *this* case," was not an issue "in *this* trial" and that the case "could have been tried without the jury ever knowing that the defendant was gay." (Emphasis added.)

## II. JURY VOIR DIRE

Defendant argues that he was denied a fair trial by the trial court's refusal to question prospective jurors during voir dire regarding any potential anti-LGBT bias. "The trial court has discretion in both the scope and the conduct of voir dire." *People v Washington*, 468 Mich 667, 674; 664 NW2d 203 (2003) (quotation marks and citation omitted). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

Voir dire of prospective jurors is governed by MCR 6.412(C), which provides:

(1) *Scope and Purpose.* The scope of voir dire examination of prospective jurors is within the discretion of the court. It should be conducted for the purposes of discovering grounds for challenges for cause and of gaining knowledge to facilitate an intelligent exercise of peremptory challenges. The court should confine the examination to these purposes and prevent abuse of the examination process.

(2) *Conduct of the Examination.* The court may conduct the examination of prospective jurors or permit the lawyers to do so. If the court conducts the examination, it may permit the lawyers to supplement the examination by direct questioning or by submitting questions for the court to ask. On its own initiative or on the motion of a party, the court may provide for a prospective juror or jurors to be questioned out of the presence of the other jurors.

Our Supreme Court summarized the principles underlying voir dire in *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994) (lead opinion by MALLET, J.), stating:

A defendant who chooses a jury trial has an absolute right to a fair and impartial jury. *Duncan v Louisiana,* 391 US 145; 88 S Ct 1444; 20 L Ed 2d 491 (1968); *People v Miller*, 411 Mich 321, 326; 307 NW2d 335 (1981). The purpose of voir dire is to elicit enough information for development of a rational basis for excluding those who are not impartial from the jury. *People v Brown*, 46 Mich App 592, 594; 208 NW2d 590 (1973); *People v Harvey*, 167 Mich App 734, 423 NW2d 335 (1988). In voir dire, meaning "to speak the truth," potential jurors are questioned in an effort to uncover any bias they may have that could prevent them from fairly deciding the case. It is the only mechanism, and the only safeguard a defendant has, for ensuring the right to an impartial jury. The propriety of the voir dire in this case turns on whether potential jurors who have been exposed to pervasive and sensationalized media coverage can "speak the truth" about their own bias, or whether a trial court must elicit more than mere self-assessment in order to safeguard a defendant's right to an impartial jury.

Our Supreme Court "has long recognized the importance of a voir dire that allows the court and the parties to discover hidden bias that would render a potential juror incompetent." *Tyburski*, 445 Mich at 619. "[A] trial court may not restrict voir dire in a manner that prevents the development of a factual basis for the exercise of peremptory challenges." *People v Taylor*, 195 Mich App 57, 59; 489 NW2d 99 (1992). On appeal, "this Court must determine whether the trial court conducted "a sufficiently probing voir dire in order to uncover potential juror bias." *Tyburski*, 445 Mich at 609.

In *Tyburski*, upon which defendant relies, the Supreme Court held that the trial court had a "duty to exercise caution in the manner it conducted voir dire" in order to reveal a potential juror's bias based on "the high likelihood of media-induced bias." *Id*. at 626. In *People v Harvey*, 167 Mich App 734, 743; 423 NW2d 335 (1988), however, this Court held that the trial court did not err by failing to excuse for cause two jurors who had been exposed to pretrial publicity about the case because both jurors stated in voir dire that they could base their decisions on the evidence presented at trial. These cases are instructive with respect to general principles concerning voir dire when jurors have been exposed to pretrial publicity about a case, creating a potential for juror bias. The present case, however, does not involve pretrial publicity. Instead, cases involving potential bias arising from a defendant's demographic identity offer more guidance. We have found no Michigan case addressing jury voir dire and possible LGBT bias, but decisions of federal courts and courts of our sister states can offer guidance. See *People v Bragg*, 296 Mich App 433, 454-455; 824 NW2d 170 (2012). While the Supreme Court cases all involve racial issues, decisions of other courts rely on those same standards in reviewing voir dire for issues regarding sexual orientation.

In *Ham v South Carolina*, 409 US 524, 527; 93 S Ct 848; 35 L Ed 2d 46 (1973), the United States Supreme Court held that "the Fourteenth Amendment required the judge in [that] case to interrogate the jurors upon the subject of racial prejudice." The defendant was "well known locally for his work in such civil rights activities as the Southern Christian Leadership Conference and the Bi-racial Committee of the City of Florence." *Id*. at 525. The defense theory was that the police framed the defendant for the drug charge to retaliate against him for his civil rights activities. *Id*. The Court held that because South Carolina law "permits challenges for cause, and authorizes the trial judge to conduct voir dire examination of potential jurors," the "essential fairness required by

the Due Process Clause of the Fourteenth Amendment requires that under the facts shown by this record the petitioner be permitted to have the jurors interrogated on the issue of racial bias." *Id*. at 527.

In *Ristaino v Ross*, 424 US 589; 96 S Ct 1017; 47 L Ed 2d 258 (1976), the trial court denied the defendants' request for voir dire regarding racial attitudes. The trial court expressed hope that jurors would "take their oaths seriously and understand the spirit of their oath," and expressed confidence that judges "would take the time to impress upon them, before, during, and after the trial, and before their verdict, that their oath means just what it says, that they are to decide the case on the evidence, with no extraneous considerations." *Id*. at 591. The Supreme Court, discussing its decision in *Ham*, observed that in that case "[r]acial issues . . . were inextricably bound up with the conduct of the trial." The Court noted that Ham was a prominent civil rights activist, and that his defense "was that he had been framed because of his civil rights activities." *Ristaino*, 424 US at 596-597. The Court stated that in *Ristaino*, by contrast, "The mere fact that the victim of the crimes alleged was a white man and the defendants were Negroes was less likely to distort the trial than were the special factors involved in *Ham*." *Id*. at 597. The Court concluded that the trial judge "acted within the Constitution in determining that the demands of due process could be satisfied by his more generalized but thorough inquiry into the impartiality of the veniremen." *Id*. at 598.

In *Rosales-Lopez v United States*, 451 US 182, 190; 101 S Ct 1629; 68 L Ed 2d 22 (1981), the Supreme Court elaborated on the distinction between *Ham* and *Ristaino*, stating:

> There is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups. As *Ristaino* demonstrates, there is no *per se* constitutional rule in such circumstances requiring inquiry as to racial prejudice. [*Ristaino*, 424 US at 596 n 8.] Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion.

In *Berthiaume v Smith*, 875 F3d 1354 (CA 11, 2017), the plaintiff attended a parade with his same-sex partner and his former same-sex partner, Jimenez. The plaintiff and Jimenez became involved in an altercation, which the defendant police officer allegedly perceived as the plaintiff chasing and assaulting Jimenez. The defendant pushed the plaintiff to stop him from pursuing Jimenez. *Id*. at 1356-1357. Although Jimenez declined to press charges against the plaintiff, the defendant arrested the plaintiff and charged him with domestic battery. *Id*. at 1357. The plaintiff brought a civil action against the officer and the municipality, asserting claims of excessive force, false arrest, malicious prosecution, and related claims. *Id*. at 1356-1357. The plaintiff asked the trial court to question prospective jurors regarding their potential bias against gay and homosexual persons. The trial court denied this request. The jury subsequently returned a verdict in the defendant's favor. *Id*. at 1357-1358.

On appeal, the Eleventh Circuit Court of Appeals held that it was "obvious" that *the case involved "an alleged domestic battery between former partners of the same sex, and that the sexual orientation of [the plaintiff] and his witnesses would be central facts at trial and were 'inextricably*

*bound up' with the issues to be resolved at trial.*" *Id.* at 1358 (emphasis added). The court concluded that "the relationship between [the plaintiff] and Jimenez, and the nature of the alleged domestic dispute between them as former partners, was of critical importance." *Id.* at 1359. The court further concluded that questioning on sexual-orientation bias was necessary because the plaintiff raised a *Batson*[1] challenge to the defendants' use of peremptory challenges to remove two potential jurors whom he believed were gay. *Id.* The court held that the trial court's general inquiries regarding the jurors' ability to be impartial and unprejudiced were too "broadly framed and not calculated to reveal latent prejudice." *Id.* at 1359. The court noted that at the time of voir dire, the jurors did not know that the case involved an alleged domestic dispute between former same-sex partners and thus had no reason to volunteer potential prejudices. *Id.* The jury was, however, questioned about bias toward law enforcement. *Id.* at 1360. The court found that the "long history of cultural disapprobation and prior legal condemnation of same-sex relationships" created a risk that bias based on sexual orientation influenced the jury. *Id.* at 1359. The court concluded that under these circumstances, the trial court abused its discretion by failing to question prospective jurors about sexual-orientation bias. *Id.* at 1360. The court stated, however, that the refusal to ask such questions would not constitute an abuse of discretion in every case. The need for questions about sexual-orientation bias "will depend on the subject matter and issues in the case and what notice the district court has that issues of sexual orientation will potentially be a central part of the evidence at trial." *Id.*

The essential principle we glean from these cases is that a trial court is required to allow voir dire regarding juror bias if the defendant's identity with a particular demographic group is "inextricably bound" with questions of fact that the jury will have to decide. Where the defendant's demographic identity is not inextricably bound with questions of fact which the jury will be called upon to decide, generalized voir dire regarding the jurors' impartiality and commitment to deciding the case based on the evidence may suffice to safeguard the defendant's right to a fair and impartial jury. Each case must be evaluated on its own facts and circumstances.

Here, defendant argues that his sexual orientation was inextricably bound with the facts of this case because his defense was that his same-sex partner, Orsette, used his knowledge of defendant's financial dealings to fraudulently induce the state to pay defendant the $14,850 refund. The record, however, does not demonstrate that defendant made such an argument below. The record on this issue is that defendant "requested to do voir dire on LGBT issues," but failed to demonstrate that sexual orientation was "inextricably bound" to the facts of this case. At most, the nature of the relationship between defendant and Orsette was relevant to the defense theory that defendant was not suspicious because Orsette often paid the couple's bills and because Orsette had ample funds in his business account. Nevertheless, the partners' motives for making those

---

[1] In *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), the United States Supreme Court held that the use of peremptory challenges to exclude members of a jury venire based on race violates the Equal Protection Clause. The present case does not present the issue of whether *Batson* applies to the use of peremptory challenges based on a juror's actual or perceived sexual orientation, and we express no opinion on that question; at least one federal court of appeals has held that *Batson* does apply under such circumstances. See *SmithKline Beecham Corp v Abbott Laboratories*, 740 F3d 471 (9 CA, 2014).

arrangements were tangential to defendant's explanation for why he relied on Orsette's explanations.

In *Ham*, the defendant's race and his participation in civil rights causes *were* the defense— "[h]is basic defense at the trial was that law enforcement officers were 'out to get him' because of his civil rights activities, and that he had been framed on the drug charge." *Ham*, 409 US at 525. Thus, race and civil rights work were "inextricably bound up with the conduct of the trial." *Ristaino*, 424 US at 597. In *Berthiaume*, 875 F3d 1354, the plaintiff's claims of wrongful arrest and malicious prosecution involved factual questions of the plaintiff's and Jimenez's conduct toward each other, and the defendant's perception of and reaction to their conduct; thus, juror bias toward LGBT persons had the potential to significantly influence how the jurors evaluated the parties' conduct.

Here, by contrast, defendant was not associated with a history of LGBT causes, and jurors were not asked to make subjective evaluations of what happened between defendant and his past partners. They were asked, instead, to judge the credibility of defendant's exculpatory theory, taking into consideration that he had made false accusations against four previous partners. Moreover, defendant's conduct in his other relationships was relevant only as it bore on his credibility. The central factual issue relevant to defendant's guilt or innocence was whether defendant cashed a refund check for the refunded overpayment, while knowing that the repayment had been induced through fraud. Defendant's sexual orientation and behavior with his partners had little relevance to this issue.

On remand, the trial court clearly enunciated the reasons for its ruling. It detailed the crimes charged, referenced the evidence, and explained why the proposed voir dire was not relevant to the issues presented. The trial court did not abuse its discretion when it denied the request.

## III. OTHER-ACTS EVIDENCE

Defendant argues that the trial court erred by excluding evidence of Orsette's involvement with other fraudulent activity and that the exclusion of this evidence violated defendant's constitutional right to present a defense. "The decision whether such evidence is admissible is within the trial court's discretion and will only be reversed where there has been a clear abuse of discretion." *People v Crawford*, 458 Mich 376, 383; 582 NW2d 785 (1988). "[W]hether a rule or statute precludes admission of evidence is a preliminary question of law that this Court reviews de novo." *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). "This Court reviews de novo whether a defendant was denied the constitutional right to present a defense." *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002).

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other

crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

"The general rule under MRE 404(b) is that evidence of other crimes, wrongs, or acts is inadmissible to prove a propensity to commit such acts." *Denson*, 500 Mich at 398. MRE 404(b)(1) "applies to the admissibility of evidence of other acts of any person, such as a defendant, a victim, or a witness." *People v Catanzarite*, 211 Mich App 573, 579; 536 NW2d 570 (1995). "At its essence, MRE 404(b) is a rule of inclusion, allowing relevant other acts evidence as long as it is not being admitted solely to demonstrate criminal propensity." *People v Martzke*, 251 Mich App 282, 289; 651 NW2d 490 (2002). Our Supreme Court has established the following test for admitting other acts evidence:

> First, the [proponent] must offer the other acts evidence under something other than a character to conduct or propensity theory. MRE 404(b). Second, the evidence must be relevant under MRE 402, as enforced through MRE 104(b), to an issue of fact of consequence at trial. Third, under MRE 403, a " 'determination must be made whether the danger of undue prejudice [substantially] outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403.' " *People v VanderVliet*, 444 Mich 52, 75; 508 NW2d 114 (1993)], quoting advisory committee notes to FRE 404(b). Finally, the trial court, upon request, may provide a limiting instruction under MRE 105. [*People v Sabin (After Remand)*, 463 Mich 43, 55-56; 614 NW2d 888 (2000).]

The federal and state constitutions guarantee a defendant's right to present a defense. US Const, Am VI; Const 1963, art 1, § 20; *People v Yost*, 278 Mich App 341, 379; 749 NW2d 753 (2008). But "[t]he right to present a defense extends only to *relevant* evidence." *People v Danto*, 294 Mich App 596, 604; 822 NW2d 600 (2011). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "Relevant evidence is admissible; irrelevant evidence is not." MRE 402. And "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403.

Preliminarily, defendant does not specify what evidence the trial court erroneously excluded. "[A]ppellants may not merely announce their position and leave it to this Court to discover and rationalize the basis for their claims; nor may they give issues cursory treatment with little or no citation of supporting authority." *VanderWerp v Plainfield Charter Twp*, 278 Mich App 624, 633; 752 NW2d 479 (2008). Defendant made several references in his testimony to Orsette's allegedly underhanded dealings. He referenced a DTE investigation that allegedly motivated him to separate himself from Orsette. Defendant elicited testimony from prosecution witnesses that they did not know who initiated the online payment that resulted in the allegedly fraudulent refund check. Thus, the jury fully was made aware that defendant blamed Orsette for procuring the refund check.

In his response to the prosecutor's motion in limine, defendant referenced a fraudulent overpayment by Orsette to DTE. Defendant does not fully explain why this evidence was necessary to his defense. Uttering and publishing a false instrument requires proof that the defendant published the false instrument "knowing it to be false, altered, forged, or counterfeit with intent to injure or defraud." MCL 750.249(1). Receiving or concealing stolen property requires proof that the defendant bought, received, or possessed "stolen, embezzled, or converted money, goods, or property knowing, or having reason to know or reason to believe," that the property was stolen, embezzled, or converted. MCL 750.535(1). Although defendant suggests that Orsette's participation in other fraudulent activity was relevant to whether Orsette was responsible for procuring the fraudulent refund check in this case, Orsette's alleged participation in or initiation of the fraudulent transaction was not a defense to defendant's alleged violation of these statutes by cashing the check, knowing or having reason to know that the refund payment was procured through the fraudulent overpayment. "Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission . . . shall be punished as if he had directly committed such offense." MCL 769.39. Accordingly, defendant has not established that the trial court abused its discretion by excluding the evidence as irrelevant, nor has he shown that exclusion of the evidence denied him an opportunity to present a defense.

## IV. DEFENDANT'S OTHER RELATIONSHIPS

Defendant argues that the trial court erred by allowing the prosecutor to cross-examine him regarding his dealings with four of his former partners. Defendant contends that the questioning violated MRE 404(b)(1) because it served no purpose other than to show that he was "a promiscuous gay man with multiple lover[s] and live-in partners." Again, we review the trial court's decision for an abuse of discretion. *Crawford*, 458 Mich at 383.

At trial, defendant claimed that he was in an exclusive, "marital-type" relationship with Orsette for a five-year period, starting in 2010. It is the nature of this relationship which defendant claimed allowed Orsette to take control over certain aspects of defendant's life, like paying defendant's bills. The prosecutor's questions, and resulting answers, were designed to rebut defendant's claim of being in a marital-type relationship with Orsette, which in turn would undercut his claim that Orsette handled certain familial matters, including paying defendant's driver responsibility fees. The questions thus were offered for a permissible purpose, and were not merely offered to show propensity. See *Martzke*, 251 Mich App at 289 (stating that MRE 404(b) evidence is admissible as long as not used to demonstrate propensity). Accordingly, the trial court did not abuse its discretion when it allowed the prosecutor to continue along this line of questioning.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Mark T. Boonstra

-10-