*Albert M. Muldrow, Jr. v. State of Maryland*, No. 1898, September Term, 2021.  Opinion by Getty, Joseph M., J.

**HEADNOTES:**

JURY – COMPETENCY OF JURORS, CHALLENGES, AND OBJECTIONS – BIAS AND PREJUDICE

When the evidence presented at trial will implicate, either directly or indirectly, the sexual orientation or sexual proclivities of a defendant or witness, the court must inquire about any potential bias among the jurors against homosexuality or homosexual acts. The court does not need to ask the *voir dire* question exactly as it is phrased, however, and may rephrase the question if appropriate.

EVIDENCE – DETERMINATION AS TO BASIS OF EXPERT'S OPINION AND RELIABILITY IN GENERAL

If the reliability of an otherwise-reliable test introduced through expert testimony is challenged, the court should conduct a hearing to determine its admissibility.  At the hearing the court should hear evidence and argument, and the proponent of the expert opinion must demonstrate its admissibility by a preponderance of the evidence.  This hearing is only necessary if there is a genuine argument that the test was performed in an unreliable manner.  Md. Rule 5-702.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1898

September Term, 2021

_____

ALBERT M. MULDROW, JR.

v.

STATE OF MARYLAND

_____

Ripken,
Tang,
Getty, Joseph M.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Getty, J.

_____

Filed: December 6, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

Responding to a call for a wellness check on March 15, 2019, Baltimore County police officers arrived at a rowhouse apartment building on Kinship Road in Dundalk, Maryland. Upon opening the apartment door, officers encountered a pungent smell that they immediately recognized as the odor of a decomposing body. Inside, they found the body of Martino Duffin ("Duffin") lying in a pool of blood from two gunshot wounds to his head caused by a gun fired at close range.

During the investigation, officers reviewed surveillance footage from a security camera mounted at the entrance to the apartment building. They quickly identified Albert M. Muldrow, Jr., ("Muldrow") as a potential suspect because the security video showed that Muldrow gained access to the building but was not a resident or frequent visitor. When questioned by a police detective, Muldrow admitted that he met the victim through an online chat room and went to Duffin's apartment in the early morning hours on March 13 to have homosexual relations with him. During the interview, Muldrow described in detail his sexual encounter with Duffin but denied participating in or knowing about the murder of Duffin.

As a result of the investigation, Muldrow was charged with first-degree murder among other counts. At a jury trial in the Circuit Court for Baltimore County, Muldrow was found guilty on eight of nine counts, including first-degree murder. On appeal, Muldrow raises multiple issues that occurred during the jury trial[1] which, for purposes of this opinion, we have consolidated into the following two issues:

---

[1] Muldrow stated the questions in his brief as:

1. Did the trial court err by refusing to ask the jury pool about potential bias against homosexuality?

2. Did the trial court err by not holding a *Daubert* hearing to rule on the admissibility of the phenolphthalein test to evaluate the methodology and principles applied by the State's serology expert?

The first question arises due to the trial court's refusal to ask prospective jurors several questions during *voir dire* that were suggested by Muldrow to identify potential biases. Among these was a question asking whether any of the potential jurors were prejudiced against gay sexual relations. Under the facts of this case, which focus on the sexual relations between two men, the trial court should have been concerned that this evidence may arouse bias against homosexuality. We conclude that during *voir dire*, the jury pool should be questioned about this potential bias.

---

1. Did the circuit court err by declining to ask prospective jurors several questions designed to identify disqualifying bias?

2. Did the circuit court err in declining to hold a *Daubert* hearing to evaluate the methodology and principles applied by the State's serologist?

3. Did the circuit court err in concluding that a defense expert's direct-examination opened the door to admitting portions of the State's serologist's report that the court excluded previously?

4. Did the circuit court err by denying defense counsel's renewed motion for mistrial after a polled juror stated that the initial verdict was not their own?

5. Did the circuit court err by preventing defense counsel from eliciting exculpatory statements from a witness who was deceased at the time of trial?

The first issue is dispositive in this case. However, we reach the second question in anticipation of the *Daubert* issue arising again on remand. The Supreme Court of Maryland formally adopted the *Daubert* evidentiary standard in *Rochkind v. Stevenson*. 471 Md. 1 (2020). This standard allows the court to use various factors to determine the reliability of expert testimony. It is not necessary for us to determine whether the circuit court erred in declining to conduct a *Daubert* hearing on the admissibility of the phenolphthalein test for our holding in this opinion. We do address this issue because, if this question arises again on remand and the test's reliability is disputed, then a *Daubert* evidentiary hearing is necessary to determine admissibility.

In addition to the questions presented above, Muldrow also asks us to consider the following issues on appeal: (1) Whether the circuit court erred in declining to ask the jury pool if they could respect Muldrow's constitutional right not to testify; (2) Whether the circuit court incorrectly found that the expert's testimony opened the door to allow a previously excluded report into evidence; (3) Whether the circuit court wrongly prevented Muldrow from eliciting an exculpatory statement from a deceased witness through a testifying officer's body camera; and (4) Whether the circuit court erred by denying Muldrow's motion for a mistrial after a polled juror stated the verdict was not her own. We discuss each party's arguments in more detail below. However, we do not need to address these additional questions because our answer to the first question is dispositive.

For the reasons set forth more fully below, the trial court judge erred by refusing to ask potential jurors about their bias against homosexuality. For this reason, we remand the

case to the Circuit Court for Baltimore County for further proceedings consistent with this opinion.

## BACKGROUND

Officers with the Baltimore County Police Department discovered Martino Duffin murdered in his apartment in Dundalk on March 15, 2019. Duffin's family had been unable to reach him, and he had not shown up for work, prompting the family to request that the police conduct a wellness check.

Duffin's apartment was in a rowhouse containing four residential units on Kinship Road. The building was equipped with a locking front door secured by either a key to open the lock or a buzzer system where an occupant could allow someone to be "buzzed in" to enter. When police arrived, a resident granted entry to the building where the officers found Duffin's apartment door unlocked.

Upon entering Duffin's unit, they encountered a strong odor of body decomposition and then discovered his body covered with a blanket. The body was fully dressed, including clothing, belt, and shoes, underneath the blanket. Duffin's wallet was flung open and resting on top of the blanket covering his body. A pool of blood on the floor was the result of two gunshot wounds to the head and face.

The apartment was mostly tidy except for kitchen cabinet doors left open with plastic bags scattered across the floor, a roll of trash bags placed on top of Duffin's bed, and the pool of blood with several of Duffin's teeth littering the crime scene where his body lay. The responding officers called homicide detectives to the scene where they collected forensic evidence.

4

Duffin's body was transported to the medical examiner's office where an assistant state medical examiner performed an autopsy. The autopsy report documents two gunshot wounds to the head—one on the right side of the forehead that had pierced the brain and the other on the left side of the upper lip. Evidence indicated the shots had been fired at close range. The medical examiner determined that the manner of death was homicide caused by the two gunshot wounds to the head. Given the body's state of decomposition, the medical examiner could not determine a time of death but opined that it could have been anywhere between 48 hours to five days (or more) before the body's examination.

Duffin's apartment building had a security camera that faced the external doorway. Police officers reviewed the security video to track movement through the building for the days corresponding to the potential time of death. The security video documented that Duffin arrived home on Tuesday, March 12, at 10:54 p.m. Other people who arrived in the late evening and early morning hours thereafter were identified as neighbors. However, one person entered the apartment building at 4:04 a.m. on Wednesday, March 13. That person was later identified as Albert M. Muldrow, Jr., and he is shown on the security video leaving the building at 10:39 a.m. on the same day. Otherwise, over the course of three days, the camera recorded several arrivals and departures mostly of persons identified as neighbors living in the building.

The investigating officers also spoke with the apartment's maintenance man, Blaine Kevin Grimaud, and showed him a portion of the security video of Muldrow wearing a winter jacket when he left Duffin's apartment building. Grimaud informed police that he had never seen Muldrow before but that he had found the winter jacket at the apartment

5

complex and stored it at his home. At trial, he testified that one of the tenants had pointed out the jacket tossed into a bush. Instead of putting the jacket in the apartment lost-and-found box or throwing it away, he took the jacket home with the intent of having it dry-cleaned and wearing it for personal use. Grimaud also found a phone and a charger in one of the jacket pockets. At that time, he attempted to access the phone to determine the owner but could not gain access because it required a passcode.

The investigating officers took the jacket and the phone as evidence. They determined the phone number associated with the phone by calling the Baltimore County 911 Communications Center. Password-protected phones are designed so that emergency calls can be placed without the password. Therefore, the 911 dispatcher was able to retrieve the phone number from the monitor's caller identification. This phone number matched the number that Duffin's family had provided to police for Duffin's personal cell phone. Upon further investigation, the phone also revealed two Google accounts associated with "Martino Duffin" and their corresponding email addresses.

With this information, the investigating officers requested a court order to retrieve business records for Duffin's cell phone. In response, they received from Sprint, Duffin's cell phone provider, a record log of calls made and received during the period corresponding to Duffin's death. The records indicated that on the morning of March 13, calls were exchanged between the cell phones of Duffin and Muldrow at 12:39, 2:10, and 3:51 a.m.

Upon identifying Muldrow as a suspect, officers took him into custody and searched his residence. Muldrow had bullets in his pocket when apprehended. Police also seized

6

several items, including Nike sneakers that resembled the shoes worn by Muldrow as shown on the security video from Duffin's apartment building.

Muldrow waived his *Miranda*[2] rights and was questioned by the lead detective, Lyndsey Buckingham. The detective informed Muldrow she was investigating an incident in Dundalk and asked if he had ever been there. He responded "yes," and told her that he met a person through a "Baltimore Ravens chat line" but did not know his name. He explained that "[y]ou just go on [the chat line], leave a message what you looking for and replies back, and sometimes you meet up, sometimes you don't" and that he had met up with a person from the chat line in Dundalk.

Detective Buckingham then told Muldrow that "the incident happened in Dundalk, and there's a male that was found deceased in his house in Dundalk." She also told him about the security video that captured him entering the building.

Throughout the interview, Muldrow described meeting and having sexual relations with Duffin:

> MULDROW:  Of course, I met him off the chat line. I went back there. It was early in the morning. It was cold as shit that day. Had sex. That's pretty much what it was, had sex and I left.
>
> \*     \*     \*
>
> MULDROW:  Got in the shower, then I left.
>
> \*     \*     \*

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

DETECTIVE:     Do you remember what he was wearing that night?

MULDROW:     It was dark.  I mean, (unintelligible) nothing on in the morning.

DETECTIVE:     Right.  Did you guys have sex in the bed or somewhere else in the house?

MULDROW:     In the bed.

DETECTIVE:     In bed.  Anywhere else in the house?

MULDROW:     No.

                    *     *     *

MULDROW:     (Unintelligible) one night stand.

                    *     *     *

DETECTIVE:     Did he ever contact you again on his phone after you left that day?

MULDROW:     Um um.  I wasn't expecting him to.

DETECTIVE:     Okay.  So you guys just kind of left, was what it was.

MULDROW:     Yeah.  We was going to probably call each other back on that day, but just - - I kind of (unintelligible) he didn't like what I had.

DETECTIVE:     Gotcha.  There was a condom that was recovered in the trash can of the kitchen.  Was that your[s] or was that his?

MULDROW:     It was his.  Well, we didn't use a condom.

DETECTIVE:     Okay.  Either one of you did.

MULDROW:     No.  He sucked my dick.  I (unintelligible) him.

                    *     *     *

MULDROW:     He sucked my dick in the morning I got up before I got in the shower.  I got in the shower, put my clothes on, left.

8

MULDROW:          I just told you I met him off the line.

DETECTIVE:        Um hum.

MULDROW:          That morning.  We hooked up, we had sex.  I left.  He was still alive, breathing, kicking.

Muldrow denied having anything to do with Duffin's death.  In addition to the description of his sexual encounter, he claimed that the bullets he had in his pocket when apprehended were ones that he picked up from Duffin's apartment.  Based upon the evidence found at the murder scene, Muldrow was charged with first-degree murder (premeditated and felony), robbery with a dangerous weapon, use of a firearm in a violent crime, illegal possession of a regulated firearm, and illegal possession of ammunition, among other charges.

The jury trial was held in the Circuit Court for Baltimore County.  Before jury selection, Muldrow proposed 62 questions for *voir dire* of the jury pool.  The court asked some, but not all, of the proposed questions.  Muldrow requested questions concerning gay sex and late-night sexual encounters between strangers.  He argued that the questions were designed to elicit bias from prospective jurors and that this was important because the jury would hear evidence of gay sexual relations between Muldrow and Duffin and many people have strong opinions about such things.  The court declined to ask these questions.

In addition, the court asked the jury pool whether they would respect Muldrow's right not to present evidence, but the court declined to ask whether jurors could respect Muldrow's right not to testify.

At trial, Muldrow attacked the expert testimony offered by the State. Laura Pawlowski, a forensic chemistry supervisor with the Baltimore County Police Department, performed serological testing of items in this case, including Muldrow's Nike sneakers. She used a phenolphthalein test, which is a presumptive test for blood (a test used by forensic laboratories since the early 1900s). She reported that the test indicated possible blood on the right Nike sneaker. No confirmatory testing was done for blood, but DNA testing showed Duffin's DNA present. Pawlowski's serology report concluded that "blood was indicated" on the sneaker.

The trial in this case was originally scheduled prior to the decision by our Supreme Court that adopted the *Daubert*[3] standard for expert witness testimony. Muldrow initially sought to exclude the expert opinion on the presumptive blood test under the prior expert witness standard known as *Frye/Reed*[4] and requested a hearing. The court denied the request for a *Frye/Reed* hearing and deemed the opinion admissible. After the *Daubert* standard was adopted in Maryland, Muldrow again moved to exclude the expert opinion and requested a hearing under the new test. The court again denied the motion and declined to have a hearing, ruling that Muldrow's argument went to weight of the evidence rather than admissibility.

---

[3] *See Rochkind v. Stevenson*, 471 Md. 1, 35 (2020) (adopting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as the test for admitting expert testimony).

[4] *See Reed v. State*, 283 Md. 374 (1978).

At trial, the court ruled that the prosecutor and the expert witness, Pawlowski, could not refer to the statement in her report that "blood was indicated." Instead, she had to testify that her test revealed "possible blood." Muldrow called an expert witness, Dr. Reich, to discuss the phenolphthalein test that Pawlowski used. Dr. Reich testified that he would regard the test result on the sneaker as "inconclusive" rather than positive. He also opined that the test should not be used in modern forensic science because of its limited utility. Following this testimony and over Muldrow's objection, the court allowed the State to introduce as evidence Pawlowski's serology report with the statement that "blood was indicated" on the sneaker because Dr. Reich's testimony had "opened the door" to the entire report.

Muldrow also sought to introduce testimony from Duffin's neighbor, Anna Cassidy, that she told police she had seen Duffin "yesterday," Thursday, March 14—a date that was after Muldrow appears on the security video leaving the building on the morning of March 13. Unfortunately, while the case was pending, Cassidy passed away from COVID-19. At trial, Muldrow sought to introduce her statement through the body camera footage of a testifying police officer. The State objected and the court ruled that the statement was inadmissible as hearsay with no qualifying exception.

After the presentation of evidence, the jury deliberated and informed the court it had reached a verdict. The verdict found Muldrow guilty of all charges except for felony murder. The court polled the jury to see if the verdict was the verdict of the individual jurors. One of the jurors said that it was not her verdict. The court sent the jury back for further deliberations, and Muldrow moved for a mistrial. The court initially reserved ruling

11

on the motion but ultimately denied it. The jury continued to deliberate but was sent home for the weekend before they reached another verdict. After returning to deliberate Monday, the jury reached the same verdict as they had before: guilty of first-degree murder (premeditated), robbery with a dangerous weapon, use of a firearm in a violent crime, illegal possession of a regulated firearm, and illegal possession of ammunition, but not guilty of first-degree murder (felony). This timely appeal followed.

## PARTIES' CONTENTIONS

Muldrow claims the trial court committed numerous errors which require reversal of his conviction. First, he argues the court erred by declining to ask the jury pool several questions he had proposed: (1) whether they would be prejudiced against gay sexual relations; (2) whether they would be prejudiced against people who meet strangers at night to have sex; and (3) whether they could respect his constitutional right to not testify.

The State responds that the court committed no error because it acted properly within its discretion. The State asserts that a question about gay sexual relations and relations between strangers was not required because the topic was not linked to his guilt or innocence and is not a mandatory topic of inquiry for *voir dire*. The State also maintains that the question about respecting the right not to testify was sufficiently covered by the court's instruction that "[a] defendant is not required to present any evidence" when asking jurors about their ability to abide by the presumption of innocence and the burden of proof.

Muldrow next argues errors regarding Pawlowski's expert testimony. He claims the court erred in declining to hold a *Daubert* hearing to evaluate the methodology and principles of her report. Relatedly, he also contends the court erred in deciding that Dr.

12

Reich's testimony opened the door to admitting the section of Pawlowski's report that the court had previously excluded.

The State counters that the general acceptance of the phenolphthalein test over a long period of time obviated the need for a *Daubert* hearing. In addition, the State claims Pawlowski's report was properly admitted because Muldrow's questioning of Dr. Reich generated an issue about the report and that Muldrow should not be allowed to criticize the report while keeping the jury from seeing the report at issue.

According to Muldrow's next argument, the court erred when it prevented him from eliciting an exculpatory statement from a deceased witness through a testifying officer's body camera. He sought to elicit the statement from Duffin's neighbor to police that she saw Duffin after the time Muldrow was known to leave his apartment building. Muldrow avers that the statement should have been admitted under the catchall exception to hearsay, which allows statements with "circumstantial guarantees of trustworthiness" to be admitted "if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." Md. Rule 5-803(24). He also argues that not allowing the neighbor's statement into evidence violated his constitutional rights to present a defense. The State responds that the neighbor's death did not present an exceptional circumstance which would justify the statement's admission under the catchall hearsay exception and further

that Muldrow pointed to no indicia of the statement's reliability. The State also asserts that the constitutional issue is not preserved because it was not raised before the trial court.

Finally, Muldrow argues the court erred by not granting his motion for a mistrial when a polled juror stated the verdict was not her own. He asserts that the denial of his motion risked coercing the jury into reaching a unanimous verdict. The State disagrees arguing that the court properly told the jury to continue deliberating without coercion.

And in response to all of Muldrow's arguments, the State argues that any errors made by the trial court were ultimately harmless.

## *VOIR DIRE* QUESTIONS

To empanel an impartial jury, a trial court examines "prospective jurors through questions propounded by the judge (or either of the parties, if allowed by the judge) to determine the existence of bias or prejudice" through the process known as *voir dire*, "literally translated" as "to say the truth." *Charles v. State*, 414 Md. 726, 733 (2010) (citations omitted). We review the trial court's decision on whether to ask a *voir dire* question for abuse of discretion, *Kazadi v. State*, 467 Md. 1, 24 (2020), and consider "whether the facts and circumstances of a case mandate a particular *voir dire* question to probe prospective jurors' bias[,]" *Charles*, 414 Md. at 734.

The Sixth Amendment to the U.S. Constitution and Article 21 of the Maryland Declaration of Rights guarantee a defendant "an impartial jury." The trial court's *voir dire* process is integral to ensuring that impartiality. *Pearson v. State*, 437 Md. 350, 356 (2014). Both the State and a defendant may challenge jurors for cause when they have revealed partiality or use peremptory challenges without justification. *See Curtin v. State*, 393 Md.

14

593, 601–02 (2006) (discussing challenges for cause and peremptory challenges). In Maryland, however, *voir dire* is limited to questions designed to elicit bias that would be cause for a juror's disqualification from service, not questions that would assist counsel in using peremptory strikes. *Pearson*, 437 Md. at 356–57. Accordingly, there is no requirement that the trial court ask a question that would not reveal cause for disqualification or where the only purpose is to fish for information on prospective jurors. *Id.* at 357.

On the other hand, "[o]n request, a trial court must ask *voir dire* questions that are reasonably likely to reveal a cause for disqualification[.]" *Kazadi*, 467 Md. at 45. Specific cause for disqualification exists when "(1) a statute disqualifies a prospective juror" or "(2) a collateral matter is reasonably liable to have undue influence over a prospective juror." *Collins v. State*, 463 Md. 372, 376 (2019) (quoting *Pearson*, 437 Md. at 357). This second category of cause includes "biases directly related to the crime, the witnesses, or the defendant[.]" *Pearson*, 437 Md. at 357. "A question aimed at uncovering a [prospective juror's] bias because of the nature of the crime with which the defendant is charged is directly relevant to, and focuses on, an issue particular to the defendant's case and, so, should be uncovered." *State v. Thomas*, 369 Md. 202, 214 (2002), *abrogated on other grounds by Pearson v. State*, 437 Md. 350 (2014).

Under these principles, if an area of inquiry is "directly related to the case before the court," the court must inquire of the jury pool about a number of potential biases including: jurors' bias against the defendant's race, ethnicity, or cultural heritage; jurors' religious affiliations if they would prevent them from reaching a fair verdict; jurors'

15

tendency to give undue weight to the testimony of police officers; any "strong feelings" the jurors have toward the crime charged, *Washington v. State*, 425 Md. 306, 315–16 (2012) (citations omitted); jurors' bias against defense witnesses, *Moore v. State*, 412 Md. 635, 640, 663 (2010); and jurors' bias in favor of the State's witness, *Bowie v. State*, 324 Md. 1, 5 (1991). In contrast, our appellate courts have held that the trial court did not abuse its discretion in declining to ask questions about prospective jurors' experience being the victim of a crime, *Pearson*, 437 Md. at 359, their bias for or against people who have served in or are employed by the military, *Washington*, 425 Md. at 321–22, their strong feelings towards handguns, *Curtin*, 393 Md. at 609–10, and how much progress they believe has been made in understanding and treating mental illness, *Grogg v. State*, 231 Md. 530, 531–32 (1963).

In *Hernandez v. State*, our Supreme Court traced the mandatory inquiry into racial bias. 357 Md. 204, 210–21 (1999). At one point, Maryland precedent required such an inquiry only when "some special circumstance warrant[ed.]" *Id.* at 217 (quoting *Thornton v. State*, 31 Md. App. 205, 215 (1976)). Such "special circumstances" would be found where the facts generated the issue of racial prejudice, such as when the victim and State's witnesses are of a different race than the defendant in a trial involving a crime of violence. *Id.* at 218 (citing *Holmes v. State*, 65 Md. App. 428, 438–39 (1985), *rev'd on other grounds,* 310 Md. 260 (1987)). Then, in 1995, our Supreme Court held that "as a matter of Maryland nonconstitutional criminal law, . . . the refusal to ask a *voir dire* question on racial or ethnic bias or prejudice under the circumstances . . . constituted reversible error." *Id.* at 219 (quoting *Hill v. State*, 339 Md. 275, 285 (1995)). The *Hernandez* Court explained

that this decision rested on "the necessity of inquiry into racial bias, not on the notion that the factual circumstances of the case generate the issue[.]" *Id.* Such inquiry is necessary because "the racial bias of jurors might impact a verdict[,]" *id.* at 220, and "[i]t is . . . realistic to believe that bias will impair impartiality[,]" *id.* at 221. Moreover, it is not necessary to inform the jury pool of the defendant's race when asking about racial bias—although the defendant may request that the court do so—leaving each prospective juror to identify race based on observation and decide whether they have prejudice toward that perceived race. *Id.* at 231–32. A question on bias against ethnicity or cultural heritage, however, requires the defendant to first identify himself within such a group before the question must be asked. *Id.* at 232.

Maryland appellate courts have not addressed whether prospective jurors' attitudes about homosexuality is a mandatory inquiry on *voir dire* upon request. In some instances, though, a jury's prejudice against homosexuality risks damaging a defendant's right to a fair trial as much as prejudice against race would. *Cf. Killie v. State*, 14 Md. App. 465, 470–71 (1972) (analogizing the prohibition of racially prejudicial statements by a prosecutor in front of the jury to negative insinuations about homosexuality).

Our Supreme Court has, however, recognized that jurors' bias against those infected with HIV or AIDS may impede a defendant's right to a fair trial. *See Wiggins v. State*, 315 Md. 232 (1989), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990). Wiggins was on trial for murder, robbery, and theft, after the death of a man Wiggins had brought home for a three-some with his roommate. *Id.* at 235–36. All three were homosexual men. *Id.* at 235. Before trial, the court informed the jury pool that the case

17

"ha[d] touches of homosexuality in it" and asked if anyone would be prejudiced by that. *Id.* at 241. No error was claimed in this regard. At trial, the court allowed the guards responsible for Wiggins to wear gloves to protect themselves from the possibility that Wiggins had HIV or AIDS, all in plain view of the jury. *Id.* at 236–37. The Supreme Court concluded that it was wrong for the trial court to so allow, albeit because the jurors could have been influenced by their perception or fear toward the disease, not because of Wiggins' homosexual identity, explaining that "it is not far-fetched that the jury, observing the gloves, thought it better, in any event, that Wiggins be withdrawn from public circulation and confined in an institution with others of his ilk." *Id.* at 245.

Some federal and state courts, however, have directly addressed the issue now before us. In *Berthiaume v. Smith*, the Eleventh Circuit reviewed a district court's refusal to ask prospective jurors about their biases or prejudices against persons who are gay or homosexual. 875 F.3d 1354, 1356 (11th Cir. 2017), *on reh'g* (Nov. 22, 2017) (per curiam). Berthiaume originally sued an officer with the Key West Police Department for excessive force, false arrest, and other claims. *Id.* On the night of his arrest, Berthiaume had attended a parade and street party in Key West with his partner, his friend, and his former partner. *Id.* When most of the group wanted to go home, Berthiaume got into a disagreement with his former partner who wanted to remain out. *Id.* Officers observed the dispute, intervened, and ultimately caused an injury to Berthiaume in an alleged effort to stop him from following his former partner. *Id.* at 1357. At trial, the district court denied Berthiaume's request to ask the jury pool, "Do you harbor any biases or prejudices against persons who are gay or homosexual?" *Id.* at 1356. After the jury found in favor of the

18

officer, Berthiaume moved for a new trial because the court had refused his *voir dire* question. *Id.* at 1357. The district court denied his motion. *Id.* at 1358.

The Eleventh Circuit determined that Berthiaume was entitled to a new trial based on the district court's refusal to ask the proposed *voir dire* question on juror bias against homosexuality. *Id.* at 1360. The court first explained the principles of required *voir dire*:

> To determine whether specific questioning is necessary in a given case, courts look to whether, under all of the circumstances presented, there is a reasonable possibility that a particular type of prejudice might have influenced the jury. The critical factor in making this determination is whether the potentially prejudicial issue is inextricably bound up with the conduct of the trial, such that there is a consequent need, under all the circumstances, specifically to inquire into [the] possible [specific] prejudice in order to assure an impartial jury.

*Id.* at 1358 (internal citations and quotation marks omitted). In Berthiaume's case, the question about bias towards people who are gay or homosexual was necessary because it was apparent that the underlying incident involved domestic battery between two former same-sex partners and the sexual orientation of Berthiaume and other witnesses would be central facts at trial. *Id.* Accordingly, the failure to ask the *voir dire* question required a new trial, *id.* at 1360, because, "[g]iven the long history of cultural disapprobation and prior legal condemnation of same-sex relationships, the risk that jurors might harbor latent prejudices on the basis of sexual orientation is not trivial[,]" *id.* at 1359 (citing *Obergefell v. Hodges*, 576 U.S. 644, 660–63 (2015)).

On the other hand, the Ninth and Tenth Circuits have reached different conclusions when the underlying facts of the case have not directly involved a defendant's sexuality. In *United States v. Click*, the Ninth Circuit considered whether the district court erred in

19

refusing to ask a *voir dire* question requested by the defendant. 807 F.2d 847, 848 (9th Cir. 1987). The court described the questions as "concerning bias against homosexuals[,]" *id.* at 849, and explained that the district court need not ask *voir dire* "questions that are 'tied to prejudice only speculatively[,]'" *id.* at 850 (quoting *United States v. Jones*, 722 F.2d 528, 529 (9th Cir. 1983)). In that case, the defendant was on trial for bank robbery, and the witness had testified that a "male customer came to her teller window and handed her a note, written in pencil on a piece of pink paper. The note said: 'This is a robbery. I have a gun. I am not alone[,]' . . . [and] demanded $2000." *Id.* at 848. The defendant attempted to show that he did not match the witness's description because he had "effeminate mannerisms," among other differences. *Id.* Although the defendant identified as homosexual, *id.* at 850, nothing in the *Click* opinion indicates that information was conveyed to the jury or featured prominently in the case apart from the mention of "effeminate mannerisms." Accordingly, the district court did not abuse its discretion by declining to ask *voir dire* questions to determine bias against homosexuality. *Id.*

In *Macguire v. United States*, the defendants had been charged with interstate transportation of a stolen motor vehicle. 358 F.2d 442, 443 (10th Cir. 1966). The topic of homosexuality came up because they asserted as a defense that, after they had threatened to reveal that the victim had "commit[ted] a homosexual act upon" one of the defendants, the victim volunteered his vehicle, and thus they had not stolen it. *Id.* at 444. Before trial, the defendants requested that the court "inquire of the prospective jurors whether they would be prejudiced against the accused should they assert an act of homosexuality by" the victim, which the court denied. *Id.* The Tenth Circuit affirmed because the proposed

20

inquiry "related to a possible attribution of homosexuality to the owner of the automobile—not the defendants." *Id.* at 445.

In reviewing this issue, several state appellate courts have determined that potential bias against homosexuality should be part of the *voir dire* inquiry when warranted by the facts of the case. In *State v. Jonas*, the Iowa Supreme Court reviewed a trial court's decision to allow a juror who expressed anti-gay bias to remain on the jury. 904 N.W.2d 566, 575 (Iowa 2017). A defendant, who identified as gay, stood trial for "first-degree murder in a case with sexual overtones." *Id.* at 567–68. Before the victim's death, the defendant and the victim had an encounter that led to kissing, which, according to the defendant was mutual—a characterization that witnesses disputed. *Id.* at 568. After conducting *voir dire* of the jury pool about potential bias against homosexuality, the court allowed a juror that repeatedly expressed anti-gay bias to remain in the jury pool. *Id.* at 569–70. The Supreme Court of Iowa determined that this was error and held that a juror who expresses anti-gay bias should be stricken for cause. *Id.* at 575.

In 1982, the Supreme Court of Maine held that the trial court erred in denying a defendant's request to question potential jurors on anti-homosexual bias where the court had not developed sufficient factual understanding of the issues in the case to determine whether the inquiry was necessary. *State v. Lovely*, 451 A.2d 900, 902 (Me. 1982). In that case, it was not necessarily apparent that the defendant was homosexual, but he had been accused of arson for setting fire to a gay bar of which he was a patron. *Id.* at 901. The court reasoned that "[i]t is axiomatic that a juror who admittedly harbors anti-homosexual

prejudice should be subject to inquiry at the trial of an individual who is or may be perceived to be a homosexual." *Id.* at 902.

The Appellate Court of Connecticut has also opined that prospective jurors' "attitudes, beliefs or prejudices toward or about sensitive issues that may prevent a person from being able to be a fair and impartial juror are appropriate *grounds for exploration*." *State v. Thornton*, 963 A.2d 1099, 1108 (Conn. App. Ct. 2009). *See also State v. Limary*, 235 A.3d 860, 866 (Me. 2020) ("Based on the evidence anticipated in a case . . . special inquiry of jurors during voir dire may be required with respect to potential bias regarding matters such as race and sexual orientation."). Thus, in cases involving sexual assault against a member of the same sex as the perpetrator, "relevant questions that delve into prejudices, beliefs and attitudes toward homosexuality should be permitted." *Thornton*, 963 A.2d at 1108.

Several state appellate courts have held that, even where inquiry regarding bias against homosexuality is appropriate, the party requesting it is not entitled to unlimited inquiry on the matter. *See State v. Rulon*, 935 S.W.2d 723, 724–26 (Mo. Ct. App. 1996) (no error where court allowed multiple inquiries before ceasing questions on the issue); *Commonwealth v. Jones*, 570 A.2d 1338, 1347 (Pa. Super. Ct. 1990) (no abuse of discretion limiting questions asked by defendant where trial court had permitted multiple questions about homosexual and racial bias and had propounded some itself); *State v. Lambert*, 528 A.2d 890, 892 (Me. 1987) (individual *voir dire* of jury pool not necessary where issue was adequately explored in general *voir dire* of jury pool). Implicit in these decisions is that probing possible bias against homosexuality is proper in the first place.

A review of cases on the subject informs our analysis in the case at hand. Where the evidence presented at trial will not implicate the sexual orientation or sexual proclivities of a defendant or witness, there will generally be no need to ask a *voir dire* question about bias against homosexuality. *See Click*, 807 F.2d at 850; *Mays v. State*, 726 S.W.2d 937, 949 (Tex. Crim. App. 1986) (en banc) (finding no error where there was no evidence of homosexuality introduced at trial). *But see State v. Van Straten*, 409 N.W.2d 448, 452–53 (Wis. Ct. App. 1987) (finding no error where court engaged in extensive *voir dire* on bias against homosexuality where crime did not involve homosexuality but pretrial publicity on the case involved AIDS and homosexuality).

However, where the evidence presented may arouse bias against homosexuality among the jurors, and the court is aware of this possibility, it must inquire with the jury pool about such bias. *See Berthiaume*, 875 F.3d at 1360; *cf. Toney v. Zarynoff's, Inc.*, 755 N.E.2d 301, 307 (Mass. App. Ct. 2001) (finding no error but cautioning that "where there [is] the possibility of prejudice against homosexuals among prospective jurors, we think that the better practice would . . . be[] to ask the question").

Muldrow's case was one where the evidence risked arousing jurors' bias against homosexuality. Although the State contends that "Muldrow overstates the significance of [his] rendezvous [with Duffin]" and that "no one suggested that [the rendezvous]" was linked to his innocence or guilt, the record reveals the contrary. At trial, Detective Buckingham testified that Muldrow had admitted having sexual relations with Duffin. The State also played Muldrow's interrogation for the jury. In the interrogation, Muldrow disclosed that he had sex with Duffin, that Duffin had "nothing on in the morning," that

23

they only had sex in the bed, that it was a "one night stand," that he did not think Duffin would call him because he thought that Duffin "didn't like what [he] had," that they did not use a condom, and that Duffin had "sucked [his] dick" before he got in the shower and left. Detective Buckingham also asked Muldrow if Duffin had assaulted or raped him.

The sexual encounter came up again in closing arguments. In its closing, the State alluded to Muldrow's potential motive for Duffin's murder:

> [U]nder Maryland law[,] no motive is required.
>
> It's possible that the *defendant was upset that [Duffin] didn't like what he had*. Do you remember when he said that to Detective Buckingham, "I thought he didn't like what I had."
>
> It's also possible that *he felt guilty for having engaged in what he had done with Mr. Duffin*. And it's also possible that he planned to rob . . . Duffin before he even got there.
>
> But what doesn't matter is whatever the reason was. Motive is not an element of any of the crimes. And I am not required to prove motive. It makes no difference.

(Emphasis added.) Accordingly, the State explicitly linked Muldrow and Duffin's "rendezvous" with Muldrow's guilt by connecting their sexual encounter with motive for murder.

It is immaterial that Muldrow identified as straight. A juror could reasonably hear the evidence at trial and assume that Muldrow was homosexual or identified with a sexual orientation other than heterosexual. It is the jury's *perception* of the defendant as homosexual that is the relevant consideration. *See Lovely*, 451 A.2d at 902; *cf. Hernandez*, 357 Md. at 231–32 (*voir dire* may focus on juror's perception of defendant's race rather

24

than defendant's claimed race). And none of the evidence introduced at trial would dispel the jury's assumption that Muldrow was homosexual.

Certainly, the trial court was made aware that evidence of homosexuality would come up during the trial and that Muldrow wanted to ensure the seated jury would not be prejudiced by such evidence. Muldrow explained that jurors would hear about "issues of sexuality," and that homosexual relations go against the beliefs of some communities, which might cause a strong reaction and result in prejudice.

We agree with the Appellate Court of Connecticut that "[a] trial court abuses its discretion by limiting the scope of *voir dire* questions when it prohibits questions concerning the discovery of prejudices a juror might harbor." *Thornton*, 963 A.2d at 1108 (emphasis added). Muldrow's case clearly involved evidence that implicated homosexuality and could arouse prejudicial feelings in jurors inclined to harbor prejudice against homosexuality. Thus, the trial court left an area of potential bias unprobed.

None of the trial court's *voir dire* questions adequately inquired about prospective jurors' prejudice against homosexuality. It need not have asked Muldrow's proposed question exactly as he phrased it. It could have rephrased the question if it determined it was appropriate to do so. *See Pearson*, 437 Md. at 369 n.6 ("Where an overbroad proposed *voir dire* question encompasses a mandatory *voir dire* question, however, a trial court should: (1) rephrase the overbroad proposed *voir dire* question to narrow its scope to that of the mandatory *voir dire* question; and (2) ask the rephrased *voir dire* question.").

We decline to engage in a harmless error analysis. Without asking whether prospective jurors were biased against homosexuality, there is no way to guarantee that all

25

members of the empaneled jury convicted Muldrow solely on the merits or if some were inclined from the outset to punish him for his sexual orientation. *See Aldridge v. United States*, 283 U.S. 308, 314 (1931) ("[I]f any one of [the jurors] was shown to entertain a prejudice which would preclude his rendering a fair verdict, a gross injustice would be perpetrated in allowing him to sit."). Accordingly, it is impossible for the State to prove "beyond a reasonable doubt," and we would not be persuaded if they tried, that the refusal to ask the jury pool about bias against homosexuality "in no way influenced the verdict[.]" *Bellamy v. State*, 403 Md. 308, 332 (2008) (quoting *Dorsey v. State*, 276 Md. 638, 659 (1976)). Therefore, we reverse Muldrow's conviction and remand.

To be clear, we are not holding that every defendant who requests a *voir dire* question about bias against homosexuality must be granted one. Instead—keeping in mind that, unlike race, sexual orientation is not a visible identity and will be known to jurors only if revealed directly or indirectly—the question must be asked only when the facts and circumstances of the trial warrant. Thus, the question will be required when the evidence introduced at trial risks arousing prospective jurors' bias against homosexuality with regards to the defendant, the victim, or witnesses.

We do not need to reach the issue that Muldrow raises about a defendant's right to not testify. We will comment that in *Kazadi*, our Supreme Court held that "[o]n request, during *voir dire*, a trial court must ask whether any prospective jurors are unwilling or unable to comply with the jury instructions on the presumption of innocence, the burden of proof, and the defendant's right not to testify." *Id.* at 48.

In this case, the trial court questioned the jury pool as follows:

Members of the jury panel, you must presume the defendant innocent of the charges now and throughout the trial[,] unless and until after you have seen and heard all of the evidence the State convinces you of the defendant's guilt beyond a reasonable doubt. A defendant is not required to present any evidence.

If the State doesn't prove every element of an offense beyond a reasonable doubt, the jury must find the defendant not guilty.

If you do not consider the defendant innocent now, or if you're not sure you will require the State to convince you of the defendant's guilt beyond a reasonable doubt, please stand and give your juror number[.]

Although this *voir dire* question touches on the presumption of innocence, the burden of proof, and the defendant's right not to present evidence, Muldrow claims that this instruction does not satisfy *Kazadi* because it does not ask the jury pool if they would respect the defendant's right not to testify.

We decline to decide whether the trial court erred by not asking the jury pool specifically about the defendant's right not to testify or whether this issue was covered in the court's instruction that the defendant need not present evidence. Instead, we conclude that the trial court erred by refusing to ask the jury pool about potential bias toward homosexuality. This error warrants remand for further proceedings. Because a remand is required on those grounds, the *Kazadi* issue need not be decided in this appeal.

## EXPERT TESTIMONY

Although we need not address Muldrow's arguments on expert testimony because the *voir dire* error requires us to remand the case for further proceedings, we will discuss his argument on conducting a *Daubert* hearing in anticipation that it will be raised again if the State decides to retry this case. Before trial, Muldrow moved to exclude any reference

by the State's expert to "blood" or "possible blood" revealed by the State's phenolphthalein test. He primarily complains that the circuit court incorrectly refused to hold a *Daubert* hearing on the admissibility of this testimony. Without a hearing, the court ruled that Muldrow's arguments went toward the weight of the evidence the jury would afford the expert opinion and not its admissibility.

A phenolphthalein test, which is also known as the Kastle-Meyer test, "is a presumptive test for blood." *State v. Pittman*, 18 A.3d 203, 207 (N.J. Super. Ct. App. Div. 2011) (quoting from a New Jersey State Police website). The test is performed by applying three reagents to a suspected bloodstain. *Id.* at 207–08. "If blood is present, a pink color change will occur within seconds." *Id.* at 208. The test is not conclusive,[5] though, because other substances can result in false positive results. *Id.*

In its brief, the State describes the phenolphthalein test as a "valid and accepted one." We have found no Maryland precedent recognizing it as such, although the Superior Court of Pennsylvania has surveyed courts which treat the test as satisfying the requirements of expert testimony and those that have limited such opinions stemming from the test. *See Commonwealth v. Hetzel*, 822 A.2d 747, 762 (Pa. Super. Ct. 2003) (collecting non-exhaustive cases). Assuming, without deciding, that the test is "valid and accepted," expert testimony associated with the test must still satisfy our requirements for admissibility of expert testimony.

---

[5] It may be necessary to perform other tests in addition to the phenolphthalein test to determine whether the blood is of human origin. *Givens v. State*, 459 Md. 694, 701 n.5 (2018).

28

"It is . . . well-established that trial courts may take judicial notice when a scientific method is broadly and generally accepted[,]" but the methodology is still subject to the requirements for admissibility of expert testimony. *Rochkind v. Stevenson*, 471 Md. 1, 20–21 (2020). Thus, a *Daubert* hearing is not always required, but the court must still carefully consider the *Daubert* factors in exercising its gatekeeping function in this regard:

> On the one hand, a *Daubert* hearing may be helpful in complicated cases involving multiple expert witnesses. And a [trial] court should conduct a *Daubert* inquiry when the opposing party's motion for a hearing is supported by conflicting medical literature and expert testimony. On the other hand, some expert testimony will be so clearly admissible that a [trial] court need not conduct a *Daubert* hearing in every case.

*United States v. Ware*, 69 F.4th 830, 846 (11th Cir. 2023) (internal citations and quotation marks omitted).

Before our replacement of *Frye-Reed* with *Daubert*, our Supreme Court used ballistic tests and blood tests as examples of "scientific technique[s] . . . so broadly and generally accepted within the scientific community" such that "a trial court may take judicial notice of [their] reliability." *Wilson v. State*, 370 Md. 191, 201 (2002). A test that is generally accepted, however, may still be performed poorly, so in adopting *Daubert* in *Rochkind*, we "embraced a regime that prizes reliability of an expert's *methodology* over its general acceptance." *Katz, Abosch, Windesheim, Gershman & Freedman, P.A. v. Parkway Neuroscience & Spine Inst., LLC*, 485 Md. 335, 342 (2023) ("*Katz Abosch*") (emphasis added).

Our Supreme Court very recently considered *Daubert*'s application to a "widely accepted" method, *id.* at 343, where the opponents objected to the way the methodology

29

was employed. In *Katz Abosch*, the Parkway Neuroscience and Spine Institute, LLC ("PNSI") sought lost profits damages for the disintegration of its medical practice allegedly caused by the malpractice of its accountants. *Id.* at 347. PNSI hired a damages expert to quantify the business' damages. *Id.* at 343. To reach her calculations, the expert used the "widely accepted" before-and-after method where "the expert compares profits before and after a damaging event[.]" *Id.* at 343, 348. The defendant accounting firm moved to exclude the expert opinion, challenging the factual basis of the expert's report. *Id.* at 349.

The circuit court conducted a *Daubert* hearing and took issue with certain data selected by the expert in calculating damages. For instance, the court expressed concern that the expert had used a profitable year as the "before" period in her methodology rather than a different year or an average of years that would have included less profitable or unprofitable years. *Id.* at 351, 355–56. The expert report also did not account for certain market conditions and other factors that could influence the calculation. *Id.* at 352. As a result, the trial court excluded the expert's opinion because her speculation, *ipse dixit* "judgment calls," and failure to consider certain information rendered her opinion unreliable and unhelpful to the jury. *Id.* at 355.

This Court reversed, largely reasoning that the issues the defendant accounting firm took with the expert opinion could be explored on cross-examination as to how much weight the jury should give her opinion but did not overtly render her opinion unreliable. *Id.* at 359–60. Disagreeing, our Supreme Court reversed this Court's decision. *Id.* at 368. The Court explained that "whether an expert's methodology is sufficiently reliable to admit the expert's testimony at trial will sometimes require a trial court to consider data and

30

assumptions that the expert has employed in deciding threshold points relating to the methodology." *Id.* at 376. It pointed to PNSI's expert's speculative judgment calls and subjective selections in concluding that the trial court did not abuse its discretion in excluding her testimony. *Id.* at 377–78.

The factual scenario in *Katz Abosch* involving lost profits of a business is markedly different than the blood test performed in Muldrow's case. However, its emphasis on the trial court's query into the underpinnings of the expert's methodology affirms that even "widely accepted" methodologies can be performed in a manner that render them unreliable. *See Rochkind*, 471 Md. at 30 ("[U]sing acceptance as the only measure of reliability presents a conundrum: a generally accepted methodology may produce 'bad science' and be admitted, while a methodology not yet accepted may be excluded, even if it produces 'good science.'").

It is the *proponent* of the expert opinion that bears the responsibility of demonstrating its admissibility by a preponderance of the evidence. *Katz Abosch*, 485 Md. at 379. A court does not necessarily need to use any of the *Daubert* factors in making its reliability determination. *Rochkind*, 471 Md. at 37. However, a *Daubert* hearing may be especially useful or necessary when the opponent raises a genuine dispute[6] over whether an otherwise reliable test may have been performed unreliably. In this case, Muldrow

---

[6] We do not mean to shift the burden to the challenger of the expert testimony but only to point out that, if no substantive issues are raised with the expert's use of a commonly used, and generally considered reliable methodology, it would be fair for the trial court to presume the methodology's reliability.

claimed that the State's phenolphthalein test was flawed and unreliable and would not support any testimony or argument about the presence of "blood" or "possible blood." Muldrow had an expert—Dr. Karl Reich—prepared to challenge the reliability of the State's phenolphthalein test, specifically that the "faint pink" test result could not be the basis for an opinion that there was blood or possible blood on the item tested.[7]

As we have said, we need not decide whether the trial court erred in refusing to hold a *Daubert* hearing about the admissibility of the phenolphthalein test. If the issue arises again on remand, however, the court should consider whether there is a genuine argument that the State's phenolphthalein test was performed in a manner that could render its conclusions unreliable. If so, the court should hear evidence and argument at a *Daubert* hearing to determine its admissibility.

We offer no opinion on whether the trial court should admit or exclude, wholly or partially, the expert testimony on the State's phenolphthalein test if such a hearing is conducted. One of the purposes of a *Daubert* hearing is to allow an opposing party to challenge the methodology of the proposed expert testimony outside the presence of the jury. *Rochkind*, 471 Md. at 27. Even if the court determines that the expert opinion is reliable and admissible, a *Daubert* hearing allows Muldrow to present evidence and

---

[7] The Baltimore County Forensic Services Section's Forensic Serology Analysis Protocol, introduced at trial by Muldrow, states that "[p]henolphthalin, the color indicator in this test, will turn bright pink" and that, for a positive result, the "solution will turn bright pink immediately (within 3 seconds)[.]" Pawlowski also testified at trial that a positive result from the phenolphthalein test would be bright pink.

challenge the expert to the fullest extent without impacting his trial strategy in front of the jury.

Since we have decided to remand the case based on the *voir dire* errors discussed *supra*, we need not address the other issues Muldrow raises about eliciting an exculpatory statement from a deceased witness or his motion for a mistrial after polling the jury.

**CONCLUSION**

The Circuit Court for Baltimore County erred by refusing to ask potential jurors about their bias towards homosexuality. For this reason, we remand the case for further proceedings consistent with this opinion.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**